David A. HERR and Pamela
F. Herr, Plaintiffs,

v.

UNITED STATES FOREST SERVICE,
Tom Vilsack, Tom Tidwell, Kathleen
Atkinson, Anthony Scardina, and Nor-
man E. Nass, Defendants,

v.

SWC, LLC, d/b/a Sylvania Wilderness
Cabins, Timothy A. Schmidt, Friends
of Sylvania, Upper Peninsula Environ-
mental Coalition., Intervenors–Defen-
dants.

Case No. 2:14–cv–105

United States District Court,
W.D. Michigan, Northern Division.

Signed 06/13/2016

Steven J. Lechner, Mountain States Legal Foundation, Lakewood, CO, for Plaintiffs.

Ryan D. Cobb, U.S. Attorney, Grand Rapids, MI, for Defendants.

## OPINION

HON. R. ALLAN EDGAR, UNITED STATES DISTRICT JUDGE

The waters of Crooked Lake in the western portion of Michigan's Upper Peninsula bear the seeds of endless litigation. *See Stupak–Thrall v. United States*, 843 F.Supp. 327 (W.D. Mich. 1994), *affirmed*, 70 F.3d 881 (6th Cir. 1995), *rehearing en banc granted and opinion vacated*, 81 F.3d 651 (6th Cir. 1996), *affirmed en banc by an equally divided court*, 89 F.3d 1269 (6th Cir. 1996), *cert. denied*, 519 U.S. 1090, 117 S.Ct. 764, 136 L.Ed.2d 711 (1997) ("*Stupak–Thrall I*"); *see also Stupak–Thrall v. Glickman*, 988 F.Supp. 1055 (W.D. Mich. 1997) ("*Stupak–Thrall II*"). The story begins with Congress' enactment of the Wilderness Act of 1964 (Wilderness Act), which established the Natural Wilderness Preservation System. *See* 16 U.S.C. § 1131–1136. In 1987 Congress enacted the Michigan Wilderness Act (MWA), which created the Sylvania Wilderness Area (Sylvania) from portions of the Ottawa National Forest. Sylvania is managed by the U.S. Forest Service. Ninety-five percent of the land surrounding Crooked Lake lies within the Sylvania Wilderness Area, while five percent, located at the north end of the lake, is privately owned. The Plaintiffs in this case, David and Pamela Herr, purchased property within this five percent section in 2010. Their claim is that the Forest Service lacked authority to promulgate an amendment (Amendment Five) to the area's forest plan, beginning in 1996. The amendment states that:

> Beginning April 1, 1996, only electric motors with a maximum size of 24 volts or 48 pounds thrust (4 horsepower equivalent) or less will be permitted on Big Bateau, Crooked, and Devil's Head Lakes within the Sylvania Wilderness. All watercraft on these lakes are restricted to a slow no-wake speed.

*Stupak–Thrall II*, 988 F.Supp. at 1058 n.2 (quoting Amendment Five). Amendment Five applies to the portion of the Lake that is within the Sylvania Wilderness Area (the ninety-five percent). *See Stupak–Thrall I*, 843 F.Supp. at 333. Plaintiffs

seek to enjoin the Forest Service from enforcing the motorboat restrictions against them, their guests, licensees, and successors. The case is now before the court on cross-motions for summary judgment, as well as the motion by Defendant–Intervenors for summary judgment.[1]

## I.

Summary judgment is appropriate only if the moving party establishes that there is no genuine issue of material fact for trial and that he is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the movant carries the burden of showing there is an absence of evidence to support a claim or defense, then the party opposing the motion must demonstrate by affidavits, depositions, answers to interrogatories, and admissions on file, that there is a genuine issue of material fact for trial. *Celotex Corp.*, 477 U.S. at 324–25, 106 S.Ct. 2548. The non-moving party cannot rest on its pleadings but must present "specific facts showing that there is a genuine issue for trial." *Id.* at 324, 106 S.Ct. 2548 (quoting Fed. R. Civ. P. 56(e)). The evidence must be viewed in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Thus, any direct evidence offered by the plaintiff in response to a summary judgment motion must be accepted as true. *Muhammad v. Close*, 379 F.3d 413, 416 (6th Cir. 2004) (citing *Adams v. Metiva*, 31 F.3d 375, 382 (6th Cir. 1994)). However, a mere scintilla of evidence in support of the nonmovant's position will be insufficient. *Anderson*, 477 U.S. at 251–52, 106 S.Ct. 2505. Ultimately, the court must determine whether there is sufficient "evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252, 106 S.Ct. 2505; *see also Leahy v. Trans Jones, Inc.*, 996 F.2d 136, 139 (6th Cir. 1993) (single affidavit, in presence of other evidence to the contrary, failed to present genuine issue of fact); *cf. Moore, Owen, Thomas & Co. v. Coffey*, 992 F.2d 1439, 1448 (6th Cir. 1993) (single affidavit concerning state of mind created factual issue).

## II.

Plaintiffs claim that the Forest Service engaged in unlawful agency action by promulgating Amendment Five, which regulates motorboat usage on Crooked Lake. PageID.62–66. To succeed on their claim, Plaintiffs must demonstrate that the Forest Service's action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). In deciding whether an agency's action is arbitrary or capricious, the Court must follow a two-step analysis, as outlined in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984):

> When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on

---

1. Defendant–Intervenors Timothy A. Schmidt (owner of Sylvania Wilderness Cabins—"SWC"), Friends of Sylvania, and the Upper Peninsula Environmental Coalition have joined this case in order to support the Forest Service's regulation of motorboats on Crooked Lake. ECF No. 14, 28. Mr. Schmidt, like Plaintiffs, own property on Crooked Lake.

the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute. *Chevron*, 467 U.S. at 842–43, 104 S.Ct. 2778. "A court's review of an agency's action for arbitrary and capricious conduct is an extremely deferential one." *Ukrainian Autocephalous Orthodox Church v. Chertoff*, 630 F.Supp.2d 779, 784 (E.D. Mich. 2009) (citing *Chevron*, 467 U.S. at 844, 104 S.Ct. 2778). However, no deference to an agency's decision or action is necessary "when the issue is whether the agency acted within its authority and power or when the constitutionality of its action is questioned." *Stupak–Thrall I*, 843 F.Supp. at 330 (listing string cite). Notably, "an agency literally has no power to act ... unless and until Congress confers power upon it." *Louisiana Pub. Serv. Comm'n v. F.C.C.*, 476 U.S. 355, 374, 106 S.Ct. 1890, 90 L.Ed.2d 369 (1986).

## A. Authority to Regulate

■ In determining whether Amendment Five should be upheld, the Court must first determine whether the Forest Service had the authority to regulate Crooked Lake. *See Louisiana Pub. Serv. Comm'n*, 476 U.S. at 374, 106 S.Ct. 1890 (noting Congress must give the agency power to act). Upon review of this issue, it is clear that the Forest Service is authorized to regulate Crooked Lake under the Wilderness Act of 1964 and the MWA, through the United States Constitution's Property Clause.

There is no doubt that Congress has the constitutional authority to regulate Crooked Lake pursuant to the Property Clause. U.S. Const. Art. IV, § 3, cl. 2. This Clause provides that "Congress shall have the power to dispose of and *make all* needful Rules and Regulations respecting the Territory or other Property belonging to the United States." *Id.* (emphasis added). The Supreme Court has held that " 'needful' regulations 'respecting' government property will sometimes include the exercise of power over *purely private* property, in order to ensure adequate protection of the federal interest." *Stupak–Thrall I*, 70 F.3d at 885 (citing *Camfield v. United States*, 167 U.S. 518, 17 S.Ct. 864, 42 L.Ed. 260 (1897) (holding that Congress could prohibit fences on private property that blocked access to federal lands)); *Kleppe v. New Mexico*, 426 U.S. 529, 538, 96 S.Ct. 2285, 49 L.Ed.2d 34 (1976) (holding that Congress, under the Property Clause, may regulate wild animals on public land); *United States v. Alford*, 274 U.S. 264, 47 S.Ct. 597, 71 L.Ed. 1040 (1927) (upholding congressional laws that prohibit building fires on or near any federal property and the failure to extinguish them); *see also Burlison v. United States*, 533 F.3d 419, 432–33 (6th Cir. 2008) (finding that, under the Property Clause, Congress may impose regulations over public land that may affect private property rights in easements over the public land). The Forest Service's authority to regulate Crooked Lake is grounded in Congress's authority to do so under the Property Clause. *See Stupak–Thrall I*, 843 F.Supp. at 331–32.

■ In general, under the Property Clause, Congress has broad authority to decide what are "needful" regulations "respecting" federal property. *See Kleppe*, 426 U.S. at 536, 96 S.Ct. 2285 ("[W]e must remain mindful that, while courts must eventually pass upon them, determinations under the Property Clause are entrusted primarily to the judgment of Congress."). Here, Congress clearly used this broad authority when it enacted both the Wilderness Act of 1964 and the MWA. The regulatory objective of these two enactments is to "preserve the wilderness character" of

designated wilderness areas, such as Sylvania. 16 U.S.C. § 1133(b); Pub. L. No. 100–184, 101 Stat. 1274(Dec. 8, 1987). Based on this objective, it is clear that Congress intended for the Forest Service to create rules and regulations to preserve Sylvania, even if those regulations affect private lands. *See Burlison*, 533 F.3d at 432–33 (noting Congress can regulate conduct that occurs both on and off federal land which affects federal land). Therefore, since Congress afforded the Forest Service the authority to create regulations in line with the purpose of the Wilderness Act and MWA, the only remaining question is whether Amendment Five falls within the scope of that purpose. To answer that question, the Court must apply the aforementioned two-part *Chevron* test to the Wilderness Act and MWA.

Under the first prong of *Chevron* (whether Congress' intent under the statute was clear in regard to the question at issue), both the Wilderness Act and MWA expressly discuss motorboat usage. With specific reference to motorboats, the Wilderness Act provides that:

Except as specifically provided in this chapter, and subject to existing private rights, there shall be *no* ... motorboats ... within any such [wilderness designated] area.

16 U.S.C. § 1133(c) (emphasis added). Moreover, in regard to preexisting motorboat usage, the Wilderness Act states that:

Within wilderness areas designated by this chapter the use of aircraft or motorboats, where these uses have already been established, may be permitted to continue *subject to such restrictions* as the Secretary of Agriculture deems desirable.

16 U.S.C. § 1133(d)(1) (emphasis added). Similarly, the MWA, which created Sylvania, provides that:

Subject to valid existing rights, each wilderness area designated by this Act shall be administered by the Secretary of Agriculture in accordance with the provisions of the Wilderness Act of 1964.

Pub. L. No. 100–184, 101 Stat. 1274, § 5.

Based on the plain language of the relevant sections of the Wilderness Act and the MWA, it is clear that Congress intended that the U.S. Forest Service (as the Secretary of Agriculture's designee) would regulate motorboat usage to the extent necessary to preserve the nature and character of Sylvania. The Forest Service undoubtedly has the authority to regulate motorboat usage on Crooked Lake pursuant to the statutes enacted by Congress through the Property Clause. Moreover, under the first prong of *Chevron*, it makes clear that Congress has spoken in a general way to the precise question at issue here.

**B. Scope of Authority**

While Congress has authorized the Forest Service to deal with motorboats in Wilderness Areas, the next question becomes whether Amendment Five exceeds the scope of the statutory authority granted by Congress; that is, whether the U.S. Forest Service's action in promulgating Amendment Five was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). To answer that question, the Court must focus on the meaning of the phrase "subject to valid existing rights" that Congress used in the MWA. *Chevron*, 467 U.S. at 842–44, 104 S.Ct. 2778. Since, under the plain language of the statute, Congress' intent is not clear, the Court must turn to the second prong of *Chevron*—whether the Forest Service's answer to the ambiguous statutory language is based upon a permissible construction of the statute. *See Chevron*, 467 U.S. at 842–43, 104 S.Ct. 2778 (noting that the second prong states that "if the statute is silent or

ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.").

*i.*

▮▮▮▮▮ The "valid existing rights" specifically at issue are riparian rights.[2] The Forest Service asserts that it, like other government entities in Michigan, has authority to regulate motorboat traffic concurrent with Michigan law. Under Michigan law, riparian rights are not absolute, as they are subject to reasonable modification by the state and federal government when it serves the · public interest. *See Stupak–Thrall I*, 843 F.Supp. at 331. For example, Michigan law is clear that local governments, pursuant to their inherent police powers, may reasonably regulate citizens' riparian rights for the protection of the health, safety, and welfare of the public. *Square Lake Hills Condo. Ass'n v. Bloomfield Twp.*, 437 Mich. 310, 318, 471 N.W.2d 321, 324 (1991); *see Thompson v. Enz*, 379 Mich. 667, 687–88, 154 N.W.2d 473, 483–84 (1967) (noting that riparian rights are subject to "reasonable use" limitations, meaning one's riparian right may not materially interfere with another's similar right). In addition, Michigan courts have concluded that many regulations, which are similar in nature to the motorboat regulations included in Amendment Five, may be upheld since they are reasonable. *See, e.g., Hess v. West Bloomfield Twp.*, 439 Mich. 550, 486 N.W.2d 628 (1992) (allowing an ordinance regulating docking of boats); *Miller v. Fabius Twp. Bd., St. Joseph Cnty.*, 366 Mich. 250, 114 N.W.2d 205 (1962) (noting the court allowed time restrictions for waterskiing);

*Cates v. Argentine Twp.*, No. 296861, 2011 WL 2586058 (Mich. Ct. App. June 30, 2011) (noting an ordinance required all riparian owners and public persons that dock their boats to be registered to the owners or occupants of the property to which they are attached); *Magician Lake Homeowners Ass'n, Inc. v. Keeler Twp. Bd. of Trustees*, No. 278469, 2008 WL 2938650 (Mich. Ct. App. Jul. 31, 2008) (upholding an ordinance that prohibits docking of boats overnight, from 12:00 a.m. to sunrise); *Twp. of Yankee Springs v. Fox*, 264 Mich.App. 604, 692 N.W.2d 728 (2004) (upholding an ordinance that regulates lake access); *Krause v. Keeler Twp.*, No. 220692, 2000 WL 33415991 (Mich. Ct. App. Jul. 28, 2000) (upholding an ordinance that prohibited overnight storing or keeping of boats on the lake, and placing, using, or maintaining docks or moors that abut a public access site). Under Michigan law, Plaintiffs undoubtedly have the riparian right to boat across the water of Crooked Lake; however, this right is subject to reasonable restrictions, which means Plaintiffs do not have the unrestrictable right to run gasoline powered motorboats at unrestricted speeds all over an adjoining water body. In fact, the case law cited clearly demonstrates that boating size and speed are precisely the type of regulation that Michigan courts have upheld as reasonable. Moreover, whatever the nature of their riparian rights, Plaintiffs cannot expect that these rights are immune to *reasonable* regulation for all time to the end of the world, amen.

▮▮▮▮▮ Similarly, the Forest Service (as part of the federal government) undoubtedly "has a power over its own prop-

---

**2.** The land at issue in this case is actually termed "littoral," which . means "land that abuts or includes a lake." *Holton v. Ward*, 303 Mich.App. 718, 721 n.1, 847 N.W.2d 1, 4 (2014), *appeal denied*, 497 Mich. 980, 861 N.W.2d 20 (2015). However, Michigan courts

often use the term "riparian" to "encompass both types of property." *Holton*, 303 Mich. App. at 721 n.1, 847 N.W.2d at 4 (citing *2000 Baum Family Trust v. Babel*, 488 Mich. 136, 138 n.1, 793 N.W.2d 633 (2010)).

erty analogous to the police power of the several states." *See Kleppe*, 426 U.S. at 540, 96 S.Ct. 2285 (quoting *Camfield*, 167 U.S. at 525, 17 S.Ct. 864) ("The general government doubtless has a power over its own property analogous to the police power of the several states."). Consequently, any regulation imposed by the Forest Service must be reasonable, just as a state's regulation made pursuant to its police power must be reasonable. The motorboat restrictions created by Amendment Five are reasonable because the restrictions do not ban motorboat usage on Crooked Lake entirely; rather, it limits the size of the motor that a person may use, and the speed at which the boat may go across ninety-five percent of Crooked Lake. In addition, these regulations are reasonable because they are rationally related to achieving the MWA's goal of preserving the wilderness character of Sylvania. *See* PageID.3932–3940 (Environmental Assessment of the effects of motorboat usage in the Sylvania Wilderness); *see also* 16 U.S.C. § 1133(d)(1) ("[T]he use of . . . motorboats, where these uses have already been established may be permitted to continue *subject to such restrictions* as the Secretary of Agriculture deems desirable.") (emphasis added); Pub. L. No. 100–184, 101 Stat. 1274, § 5 (noting that the Secretary of Agriculture may administer regulations in accordance with the Wilderness Act). Overall, the Forest Service's motorboat regulations stemming from Amendment Five are reasonable, as

Amendment Five regulates riparian rights to the same extent Michigan regulates riparian rights. As such, the Forest Service did not act arbitrarily or capriciously by enacting a regulation pertaining to motorboat size and speed on Crooked Lake.[3]

*ii.*

■ On somewhat narrower grounds, and as specifically applied to the Plaintiffs in this case, Amendment Five also reasonably flows from the MWA's "valid *existing* rights" language. Pub. L. No. 100–184, 101 Stat. 1274, § 5 (emphasis added). The Forest Service referenced a congressional committee report which noted that "*preexisting* motorboat use . . . may be permitted to continue insofar as this use does not conflict with or adversely affect wilderness values." PageID.4063 (citing the MWA Congressional Committee Report) (emphasis added). It might then be reasonably said that what Congress intended was that only those riparian owners who had used motorboats on the lake in the past could continue to do so.[4] Thus, it could reasonably be said that Congress meant to, in effect, "grandfather" in those riparian owners who at the time of the enactment of the MWA had previously used motorboats on Crooked Lake. David and Pamela Herr, the Plaintiffs in this case, had no pre-existing right to use motorboats on the lake. They purchased their property in 2010—twenty-three years after Congress enacted the MWA, and fourteen years af-

---

**3.** The motorboat restrictions apply to all riparian owners on Crooked Lake except one—the Stupak–Thrall family. This is because in *Stupak–Thrall II*, 988 F.Supp. 1055, the district court enjoined the Forest Service from enforcing Amendment Five's motorboat restrictions against that riparian owner. The other plaintiffs in *Stupak–Thrall II* (the Gajewskis), who then owned a resort on Crooked Lake, claimed that the motorboat restrictions would harm their business. Ironically, the Gajewskis sold their resort to the

Intervenors in this case (Timothy Schmidt and SWC), who now seek to uphold the Forest Service regulation because the unrestricted use of motorboats adversely impacts their business. PageID.9847–9850.

**4.** The plaintiffs in *Stupak–Thrall II*, 988 F.Supp. 1055, were longtime property owners who had used motorboats on the lake prior to the enactment of the Wilderness Act and the MWA.

ter Amendment Five had been in effect. It is certainly reasonable for the Forest Service to conclude that the Plaintiffs do not have "valid existing rights" that allow them to motorboat without restrictions on Crooked Lake.

▮▮▮▮▮ Not surprisingly, however, Plaintiffs do not agree that this interpretation of "valid existing rights" is reasonable. Instead, Plaintiffs contend that because riparian rights run with the land in Michigan, Plaintiffs are entitled to run any size boat at any speed across the entirety of Crooked Lake (since their predecessor in title had this ability). While it appears that riparian rights in Michigan do run with the land, *Holton v. Ward*, 303 Mich.App. 718, 847 N.W.2d 1 (Ct. App. 2014), Plaintiffs' interpretation of "subject to valid existing [riparian] rights" effectively omits the word "existing" from the statute. *See* PageID.9966 (Defendant–Intervenors' Reply in Support of Summary Judgment) (citing *United States v. Mateen*, 764 F.3d 627, 631 (6th Cir. 2014) (noting that when determining the plain meaning of a statute, courts should look "at the language and design of the statute as a whole.")). By omitting the word "existing" from the MWA's phrase "subject to valid existing rights," Plaintiffs' ignore the "principle that [the courts] assume 'each term [in a statute has] a particular, nonsuperfluous meaning.'" *Mateen*, 764 F.3d at 631 (quoting *Bailey v. United States*, 516 U.S. 137, 146, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995)). The word "existing" relates to time; thus, when reading the phrase "subject to valid existing rights," it is clear that Congress intended the "valid rights" it was referencing to relate to the timing of the enactment of the MWA. If Congress intended for this phrase to apply to *all* valid rights, not just the ones in *existence* at the time the MWA was enacted, it would not have included the word "existing" in the phrase "subject to valid existing rights." *See id.* This interpretation of "subject to valid existing

rights" affords meaning to each word of that phrase. Consequently, as applied to the Plaintiffs, Amendment Five reasonably regulates their motorboat usage.

### III.

The Forest Service acted within its authority when promulgating Amendment Five modifying motorboat usage on Crooked Lake. Its actions in doing so were not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. Moreover, the Plaintiffs in this case are not immune from the motorboat restrictions on Crooked Lake. A Judgment will be entered denying Plaintiff's motion for summary judgment, and granting Defendant's cross-motion for summary judgment, and granting Defendant–Intervenors' motion for summary judgment.

