Kathy STUPAK–THRALL; Michael A. Gajewski; and Bodil Gajewski, Plaintiffs,

v.

Daniel GLICKMAN, Secretary of Agriculture; Michael P. Dombeck, Chief of the United States Forest Service; Bob Jacobs, Regional Forester for Region IX of the United States Forest Service; Phyllis Green, Forest Supervisor of the Ottawa national Forest; and the United States Forest Service; Defendants.

No. 2:96–CV–054.

United States District Court, W.D. Michigan, Northern Division.

Dec. 16, 1997.

Todd Stubbs Welch, Denver, CO, for PLaintiffs.

Judd R. Spray, Asst. U.S. Atty., Michael H. Dettmer, U.S. Atty., Marquette, MI, for Defendants.

Walter Kuhlmann, Boardman, Suhr, Curry & Field, Madison, WI, for Movant.

## OPINION

ROBERT HOLMES BELL, District Judge.

This is an action by riparian landowners challenging the authority of the Forest Service to prevent their use of gas powered motor boats on those portions of Crooked Lake that are within the boundaries of the Sylvania Wilderness.[1] This matter is before the Court on the parties' cross-motions for summary judgment.

### I.

In 1964 Congress enacted the Wilderness Act of 1964, 16 U.S.C. § 1131 et seq., for the purpose of preserving lands in their natural condition. Wilderness areas are defined as "area[s] where the earth and its community of life are untrammeled by man, where man himself is a visitor who does not remain." 16 U.S.C. § 1131(c).

In 1987 the Sylvania Wilderness was added to the National Wilderness Preservation System through the enactment of the Michigan Wilderness Act ("MWA"), Pub.L. No. 100–184, 101 Stat. 1274. The Sylvania Wilderness, which is part of the Ottawa National Forest, is located on the Michigan/Wisconsin border of the Upper Peninsula of Michigan, and includes 18,327 acres with approximately 36 lakes, including Crooked Lake.

Ninety-five percent of Crooked Lake lies within the boundaries of the Sylvania Wilderness. Only the northernmost bay is outside the Sylvania Wilderness. There are a total of 11 private property owners along this north shore of Crooked Lake, including the Plaintiffs Kathy Stupak–Thrall, Michael A. Gajewski, and Bodil Gajewski.

The Sylvania Wilderness is administered by the United States Forest Service. In 1992 the USFS promulgated Amendment No. 1 to the Land and Resource Management Plan for the Ottawa National Forest. Amendment No. 1 prohibits, among other things, the use of sailboats, houseboats, and non-burnable disposable food and beverage containers in the Sylvania Wilderness.

Plaintiffs appealed Amendment No. 1 to the Regional Forester and the Chief of the Forest Service. After exhausting their administrative remedies they filed an action challenging Amendment No. 1 in this court. By opinion dated January 24, 1994, the district court upheld Amendment No. 1. Stupak–Thrall v. United States ("Stupak–Thrall I"), 843 F.Supp. 327 (W.D.Mich.1994) (Quist, J.), aff'd, 70 F.3d 881 (6th Cir.1995), vacated, 81 F.3d 651 (6th Cir.1996), aff'd by an equally divided en banc court, 89 F.3d 1269 (6th Cir.1996), cert. denied, ―― U.S. ――, 117 S.Ct. 764, 136 L.Ed.2d 711 (1997). The Sixth Circuit ultimately affirmed the judgment of the district court by an equally divided en banc court. Because the Sixth Circuit was equally divided, its review of Stupak–Thrall I has resulted in no law of the circuit.

On May 31, 1995, the Forest Service adopted Amendment No. 5 to the Land Resource Management Plan for the Ottawa National Forest. Amendment No. 5 restricts motorboat usage within the Sylvania Wilderness to those motorboats equipped with electric motors up to a maximum size of 24 volts or 48 pounds of thrust and a slow no-wake speed.[2] Plaintiffs appealed Amendment No.

---

1. "Strictly speaking, land which includes or abuts a river is defined as riparian, while land which includes or abuts a lake is defined as littoral." Thies v. Howland, 424 Mich. 282, 288 n. 2, 380 N.W.2d 463, 466 (1985) (citing McCardel v. Smolen, 404 Mich. 89, 93, n. 3, 273 N.W.2d 3 (1978)). This Court will follow the practice of many Michigan courts and use the term "riparian" to describe both types of land. See, e.g., ·Thies, 424 Mich. at 288 n. 2, 380 N.W.2d 463; Thompson v. Enz, 379 Mich. 667, 154 N.W.2d

473 (1967); Mumaugh v. McCarley, 219 Mich. App. 641, 646, 558 N.W.2d 433, 435 (1996).

2. Amendment No. 5 provides:
 Beginning April 1, 1996, only electric motors with a maximum size of 24 volts or 48 pounds thrust (4 horsepower equivalent) or less will be permitted on Big Bateau, Crooked, and Devil's Head Lakes within the Sylvania Wilderness. All watercraft on these lakes are restricted to a slow no-wake speed.

5 to the Regional Forester and to the Chief of the Forest Service. They objected to Amendment No. 5 because it affects their riparian right to continued use of the entire lake for fishing, gas powered motorboating, and other recreational purposes.

Plaintiff Kathy Stupak–Thrall owns property on Crooked Lake that originally belonged to her grandfather. The property has been in her family since 1939. Her family has used gas powered motors ranging from 5 to 40 horsepower on Crooked Lake since the 1940's for fishing and waterskiing. Stupak–Thrall also owns a 2–unit rental called Fox's Den on Crooked Lake. Her renters come primarily for fishing. Potential renters have told Stupak–Thrall that they will not rent if they cannot use gas powered motor boats.

Michael and Bodil Gajewski have owned property on Crooked Lake since 1980 when they purchased the Crooked Lake Resort. Michael Gajewski was a major in the United States Army. He was discharged in 1984 due to his disability from multiple sclerosis. Crooked Lake Resort is now their primary source of income.

The Gajewski's rent out 6 cabins at Crooked Lake Resort by the week. Fourteen foot aluminum fishing boats with 8 to 20 horsepower motors are provided with the cabins. Most of the resort customers are repeat customers who have been coming to the resort since the 1950's primarily to fish. Some guests bring their own boats.[3] After news was received about the passage of Amendment No. 5 and the ban on gas motors, Mr. Gajewski noticed an immediate decline in reservations.

Crooked Lake is approximately 3 miles from north to south, with numerous bays and inlets. Mr. Gajewski believes that if his customers are not allowed to use gas motors and are restricted to using electric trolling mo-

tors, they will not return to the resort and he fears his business will not survive.

After their appeals to the Forest Service were denied, Plaintiffs filed the present action against the Secretary of Agriculture, the Chief of the United States Forest Service, the Regional Forester for Region IX of the United States Forest Service, the Forest Supervisor of the Ottawa National Forest and the United States Forest Service, contending that the Forest Service is without constitutional or statutory authority to regulate their use of gas powered motor boats on the entire surface of Crooked Lake. Plaintiffs raise two additional issues that are not part of Amendment No. 5 and which were not the subject of Plaintiffs' appeals before the Forest Service—restrictions on snowmobiling on Crooked Lake and permit requirements.[4]

Plaintiffs' first amended complaint contains seven counts alleging: 1) violation of civil rights; 2) violation of the due process clause; 3) violation of Forest Service policies; 4) violation of takings clause; 5) violation of Michigan law and the Weeks Act; 6) violation of Plaintiffs' constitutional right to travel; 7) violation of Plaintiffs' rights under Michigan law to use snowmobiles on their private property. Plaintiffs seek declaratory and injunctive relief including entry of judgment holding that Amendment No. 5 is an unconstitutional taking of Plaintiffs' private property rights without due process of law contrary to the Fifth Amendment of the United States Constitution and contrary to § 9 of the MWA.

The parties have filed cross motions for summary judgment. The Upper Peninsula Environmental Coalition ("UPEC") has filed an amicus brief.

## II.

Defendants contend that the issues related to the Forest Service's authority to promul-

---

**3.** The Sylvania Wilderness has "superb hunting, and fishing for large and small mouth bass, lake trout, walleye, northern pike and numerous panfish." House Report 100–29, Part I.

**4.** Plaintiffs have produced evidence that in January 1995 the USFS placed a sign at the south end of the channel of the northernmost bay of Crooked Lake stating: "No Snowmobiling Be-

yond This Point." Plaintiffs have also produced evidence that sometime after March 5, 1993 and before January 24, 1994, Defendants began requiring Plaintiffs and their guests to obtain a permit to use that portion of Crooked Lake located within the boundaries of the Sylvania Wilderness.

gate regulations for the Sylvania Wilderness which impact the rights of riparian owners were fully litigated in the prior proceeding in *Stupak–Thrall I* and that the doctrines of res judicata and collateral estoppel preclude this Court from revisiting these issues.

■ Although "res judicata" is generally understood to bar the relitigation of the same claim or cause of action and "collateral estoppel" is generally understood to bar the relitigation of the same issue, *Drummond v. Comm'r of Social Sec.*, 126 F.3d 837, 840 (6th Cir.1997), this Court will follow the recommendation of the Sixth Circuit Court of Appeals and refer to these concepts as "claim preclusion" and "issue preclusion." *Heyliger v. State Univ. & Comm. College Sys.*, 126 F.3d 849, 852 (6th Cir.1997) (quoting *Barnes v. McDowell*, 848 F.2d 725, 728 n. 5 (6th Cir.1988) *cert. denied*, 488 U.S. 1007, 109 S.Ct. 789, 102 L.Ed.2d 780 (1989)).[5]

> Issue preclusion refers to the effect of a judgment in foreclosing relitigation of a matter that has been litigated and decided. This effect also is referred to as direct or collateral estoppel. Claim preclusion refers to the effect of a judgment in foreclosing litigation of a matter that never has been litigated, because of a determination that it should have been advanced in an earlier suit.

*Id.* (quoting *Migra v. Warren City School Dist. Bd. of Educ.*, 465 U.S. 75, 77 n. 1, 104 S.Ct. 892, 894 n. 1, 79 L.Ed.2d 56 (1984)). Both concepts are intended to "relieve parties of the cost and vexation of multiple lawsuits, conserve judicial resources, and, by preventing inconsistent decisions, encourage reliance on adjudication." *Drummond*, 126 F.3d at 840 (quoting *Allen v. McCurry*, 449 U.S. 90, 94, 101 S.Ct. 411, 414–15, 66 L.Ed.2d 308 (1980)).

■ Claim preclusion has four elements:

1. A final decision on the merits in the first action by a court of competent jurisdiction;

2. The second action involves the same parties, or their privies, as the first.

3. The second action raises an issue actually litigated in the first action or which should have been litigated in the first action; and

4. An identity of the causes of action.

*Sanders Confectionery Products v. Heller Financial*, 973 F.2d 474, 480 (6th Cir.1992) (citations omitted), *cert. denied*, 506 U.S. 1079, 113 S.Ct. 1046, 122 L.Ed.2d 355 (1993).

In this action Plaintiffs challenge Defendants' authority to implement portions of Amendment No. 1 and all of Amendment No. 5 which restrict Plaintiffs' use of the entire surface of Crooked Lake for motorboating and snowmobiling.

■ Amendment No. 1 clearly restricts the use of snowmobiles within the wilderness area, by making any non-emergency use of snowmobiles subject to authorization by the Forest Supervisor. Amendment No. 1 also states that specific management direction pertaining to motorized use on Crooked Lake will be listed under a future amendment to the Ottawa National Forest Land and Resource Management Plan. The Court agrees with Defendants that to the extent Plaintiffs are challenging that portion of Amendment No. 1 that restricts snowmobiling on Crooked Lake, they are barred by the doctrine of claim preclusion because they should have raised this argument when they challenged the other lake restrictions contained in Amendment No. 1. This Court will not reopen argument on Amendment No. 1. To the extent Plaintiffs are anticipating a future amendment that more specifically addresses and regulates snowmobile use, their challenge is not ripe.

■ Motorboating and Amendment No. 5 were not at issue in *Stupak–Thrall I*. Accordingly, Plaintiffs have not yet had an opportunity to challenge the issuance of Amendment No. 5. Claim preclusion does not prevent Plaintiffs from challenging Amendment No. 5

---

5. The term "res judicata" in fact consists of both preclusion concepts: issue preclusion and claim preclusion. *Heyliger*, 126 F.3d at 852. Accordingly, the Sixth Circuit has expressed its "hope that litigants, in the interests of precision and clarity, will formulate arguments which refer solely to issue or claim preclusion and which refrain from using the predecessors of those terms, whose meanings have become so convoluted." *Id.*

in this action. Defendants contend, nevertheless, that issue preclusion bars Plaintiffs from relitigating those issues that were necessarily decided in *Stupak–Thrall I.*

■ Under the doctrine of issue preclusion a party may be precluded from re-litigating issues which were decided in previous litigation if the following elements are present:

1. The issue precluded must be the same one involved in the prior proceeding;

2. The issue must actually have been litigated in the prior proceeding;

3. Determination of the issue must have been a critical and necessary part of the decision in the prior proceedings; and

4. The prior forum must have provided the party against whom estoppel is asserted a full and fair opportunity to litigate the issue.

*Central Transport, Inc. v. Four Phase Systems, Inc.,* 936 F.2d 256, 259 (6th Cir.1991).

■ Defendants contend that the issue of whether the phrase "subject to valid existing rights" baring all management decisions which interfere with the exercise of existing riparian rights was fully litigated and resolved against Plaintiffs in the prior proceeding.

The Court does not agree. The prior action addressed sailboats and houseboats, activities that Plaintiffs had not engaged in. Central to the district court's ruling in *Stupak–Thrall I* was the determination that the restrictions in Amendment No. 1 were reasonable given the minimal impact on Plaintiffs' riparian uses of Crooked Lake. *Stupak–Thrall I,* 843 F.Supp. at 334.

Amendment No. 5 differs significantly from Amendment No. 1. Amendment No. 5, with its absolute ban on gas motors and strict limitations on electric motors, would impose more than a slight restriction on Plaintiffs' current use of the lake. Amendment No. 5 does not just affect a hypothetical use of the lake by Plaintiffs. It affects Plaintiffs' long standing pre-existing use of the

lake, a use that is central to Plaintiffs' livelihood and enjoyment of Crooked Lake.

Because the determination of reasonableness in the prior action was based in large part on the impact on Plaintiffs' prospective use, this action presents issues not resolved in the prior action. The prior action did not purport to resolve the issue of whether the Forest Service's authority to regulate the surface waters of Crooked Lake extended to the right to restrict a historic and existing activity such as motorboating by riparian owners.

The Court does not believe that its consideration of the issues raised herein are precluded by considerations of either issue preclusion or contradictory law in the district. Amendment 5 is a new rule, with a different and much greater impact on the Plaintiffs. It raises issues of pre-existing use that were not present in their challenge to Amendment No. 1. Accordingly, the Court declines to apply the doctrine of issue preclusion in this case.

**III.**

Plaintiffs challenge the actions of an administrative agency of the federal government. Accordingly, to succeed on the merits of their claims Plaintiffs must show that the agency action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

■ "[A]n agency literally has no power to act ... unless and until Congress confers power upon it." *Louisiana Public Serv. Comm'n v. FCC,* 476 U.S. 355, 374, 106 S.Ct. 1890, 1901, 90 L.Ed.2d 369 (1986). Accordingly, in determining whether the Forest Service had authority to issue Amendment No. 5 banning the use of gas motors by riparian owners on Crooked Lake, this Court must look to the governing statutes.

The governing statute in this case is the Michigan Wilderness Act of 1987 ("MWA"). The MWA incorporates by reference the provisions of the Wilderness Act of 1964.[6]

**6.** Section 5 of the Michigan Wilderness Act provides as follows:

Subject to valid existing rights, each wilderness area designated by this Act shall be administered by the Secretary of Agriculture in accordance with the provisions of the Wilderness Act of 1964 governing areas designated by that Act as wilderness areas....

The government has pointed out that Section 4 of the Wilderness Act of 1964 specifically provides for regulation of motorboats by the Forest Service:

Within wilderness areas designated by this chapter the use of aircraft or motorboats, where the uses have already become established, may be permitted to continue subject to such restrictions as the Secretary of Agriculture deems desirable.

16 U.S.C. § 1133(d)(1).

According to the government, the Court need go no further in its analysis of the Forest Service's authority to issue Amendment No. 5. The government contends that section (4) of the Wilderness Act provides clear evidence of Congress' delegation of its authority under the Property Clause to the Forest Service to regulate use of motorboats on the surface waters of wilderness areas, and also evidences a congressional intent that the fact of prior motorboat use in a wilderness area does not establish or create a perpetual right to use motorboats on the surface waters within wilderness areas.

The government's argument correctly defines the Forest Services' authority with respect to most wilderness areas, but it ignores the fact that the MWA makes the Forest Service's authority over the Sylvania Wilderness subject to limitations that are not part of the Wilderness Act. The Forest Service derives its authority over the Sylvania Wilderness from the MWA. Although the MWA provides that the wilderness areas created by the act are to be managed "in accordance with the provisions of the Wilderness Act of 1964," that management is "[s]ubject to valid existing rights." [7]

Because the MWA makes the Forest Service's administration of the Sylvania Wilderness "subject to valid existing rights," it is evident that Congress did not grant to the Forest Service the full extent of Congress' authority under the "necessary and proper clause." Congress limited the authority of the Forest Service over those wilderness areas covered by the MWA by making its exercise of authority "subject to valid existing rights."

There does not appear to be any real dispute that Plaintiffs' riparian rights are "valid existing rights" to which the Forest Service regulations are subject under the wilderness acts.

 Plaintiffs have a "valid existing right" to use gas motor boats on Crooked Lake. Riparian rights are valid existing rights. Under Michigan law riparian owners share in common the right to use the entire surface of the lake for boating and fishing, so long as they do not interfere with the reasonable use of the waters by the other riparian owners. *Hall v. Wantz*, 336 Mich. 112, 116–17, 57 N.W.2d 462 (1953); *Burt v. Munger*, 314 Mich. 659, 663–64, 23 N.W.2d 117 (1946).

When there are several owners to an inland lake, such proprietors and their lessees and licensees may use the surface of the whole lake for boating, swimming, fishing and other similar riparian rights, so far as they do not interfere with the reasonable use of the waters by other riparian owners.

*Pierce v. Riley*, 81 Mich.App. 39, 45, 264 N.W.2d 110, 114 (1978). *See, e.g., Thompson v. Enz*, 379 Mich. 667, 154 N.W.2d 473, 476 (1967).

As noted by the district court in *Stupak–Thrall I*, "[t]he 'valid existing rights' clause in the MWA is a simple, straightforward savings clause that is not limited to a particular kind of right. . . ." *Stupak–Thrall I*, 843 F.Supp. at 330. "[T]he MWA should be read to make administration of the Sylvania Wil-

---

7. Section 5 of the MWA provides:

Administration of wilderness Areas—*Subject to valid existing rights,* each wilderness area designated by this Act shall be administered by the Secretary of Agriculture in accordance with the provisions of the Wilderness Act of 1964 governing areas designated by the Act as wilderness areas except that with respect to any areas designated in this Act, any reference in such provisions to the effective date of the

Wilderness Act of 1964 shall be deemed to be a reference to the effective date of this Act. (emphasis added).

Although the Wilderness Act contains a similar phrase—"subject to existing private rights"—this limitation in the Wilderness Act only applies to bans on commercial enterprises and permanent roads and has no application to this case. *See* 16 U.S.C. § 1133(c); *Stupak–Thrall II*, 89 F.3d at 1281–82 (Boggs, J., dissenting).

derness subject to plaintiffs' valid riparian rights, as established under state law." *Id.* Both the concurring and dissenting opinions issued by the court of appeals were in agreement. "Throughout this litigation, we have assumed that the plaintiffs' riparian rights may count as 'valid existing rights' to which Forest Service regulations are 'subject' under the wilderness acts." 89 F.3d at 1269 (Moore, J., concurring). "The statute could not be clearer—the Forest Service cannot regulate in a way that invades or destroys 'valid existing rights.' It seems beyond cavil to me that the phrase 'valid existing rights' refers to property rights, most of which are created by state law, protecting them from invasion or disparagement by the Forest Service." *Stupak–Thrall,* 89 F.3d at 1285 (Boggs, J., dissenting).

▪ Defendants have alerted the Court to no language in the statute that would suggest that the term "valid existing rights" should be given anything other than its plain meaning. Any ambiguity or conflict in this case is caused not from a review of the statute itself, but by reference to the legislative history. Defendants and amicus UPEC dismiss the "subject to valid existing rights" language on the basis that the legislative history shows Congress' intent to allow reasonable regulation of motorboat use. Defendants would prefer the Court to ignore the "valid existing rights" language of the statute and to look instead to language found within the legislative history. The cardinal rule of statutory construction, however, is to save and not destroy. *United States v. Bazel,* 80 F.3d 1140, 1145 (6th Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 210, 136 L.Ed.2d 145 (1996). The statutory limitation on the Forest Service's power cannot be ignored merely because it appears to be at odds with the legislative history.

▪ Moreover, where "the plain meaning of the statute is unambiguous, there is no need to examine the legislative history." *Audette v. Sullivan,* 19 F.3d 254, 256 (6th Cir.1994). "[C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there." *Connecticut Nat. Bank v. Germain,* 503 U.S. 249, 253–54, 112 S.Ct. 1146, 1149, 117 L.Ed.2d 391 (1992). "When the words of a statute are unambiguous, then, this first canon is also the last: 'judicial inquiry is complete.'" *Id.* at 254, 112 S.Ct. at 1149 (quoting *Rubin v. United States,* 449 U.S. 424, 430, 101 S.Ct. 698, 701–02, 66 L.Ed.2d 633 (1981)).

Even if the Court were to conclude that the statute is ambiguous, consideration of the legislative history would not dictate a different result. There are several references in the legislative history to the regulation of pre-existing motorboat use on three lakes in the Sylvania Wilderness.[8] All three lakes had public boating access. Of the three lakes mentioned in the legislative history, only Crooked Lake has private residences on it. No mention is made in these reports about the private residences on Crooked

---

**8.** House Report 100–29, Part I, states in pertinent part:

2. *Sylvania Wilderness.*—In designating this area as wilderness, the Committee is aware that motorboats are currently used for fishing and other purposes on Big Bateau, Devils Head and Crooked Lakes. In accordance with section 4(d)(1) of the Wilderness Act, such preexisting motorboat use may be permitted to continue on the 3 lakes subject to such restrictions (motor horsepower limits, levels of use, etc.) as the Forest Service deems appropriate and desirable. It is the Committee's understanding that the issue of motorboat use is currently being reviewed in the land management planning process for the Ottawa National Forest, and that future use will be guided by the plan.

House Report 100–29, Part II, states in part:

With regard to the Sylvania area in the Ottawa National Forest and Sturgeon River Gorge wilderness, the Forest Service should consider that in accordance with section 4(d)(1) of the Wilderness Act, pre-existing motorboat use on Big Bateau, Devils Head, and Crooked Lake within the Sylvania Wilderness, may be permitted to continue, insofar as this use does not conflict with or adversely affect wilderness values.

Senate Report 100–206 states in part:

*Sylvania Wilderness*—In designating this area as wilderness, the Committee is aware that motorboats are currently used for fishing and other purposes on Big Bateau, Devils Head and Crooked Lakes. In accordance with section 4(d)(1) of the Wilderness Act, the Committee believes that pre-existing motorboat use on these lakes may be permitted to continue, insofar as this use does not conflict with or adversely affect wilderness values.

Lake. Because no distinction was made in the legislative history between regulating the public's use with the riparians' use of the lake for motorboating, the legislative history can be understood to refer only to regulation of the public's use of the lake. *See* 89 F.3d at 1289 (Boggs, J., dissenting).

There is also some evidence in the administrative record that the Sylvania Wilderness might not have been established but for a congressional compromise to accept established motorboat use on Crooked lake. *See Stupak–Thrall II,* 89 F.3d at 1274 & 1293 (Boggs, J., dissenting). Dave Morton, Forest Supervisor, sent a letter to United States Congressman Robert Davis, stating that "without the original Congressional compromise of accepting the established pre-existing valid right of motorized use on Crooked .... lake[ ], we feel that we would not have a Sylvania Wilderness today."

Plaintiffs' riparian rights are "valid existing rights" to which Forest Service regulations are subject under the wilderness acts. These riparian rights include the right to continue their pre-existing right to engage in motor boating on the surface waters of the entire lake. To the extent that Amendment No. 5 limits Plaintiffs' valid existing right to use gas powered motor boats on the surface of Crooked Lake, it exceeds the Forest Service's authority and is not in accordance with law.

### IV.

There is an independent and alternative basis for holding Amendment No. 5 invalid as applied to these Plaintiffs.[9] The restriction in Amendment No. 5 against the use of motor boats on Crooked Lake effects a taking of Plaintiffs' private property without just compensation in violation of the Fifth Amendment of the United States Constitution.[10]

The Fifth Amendment guarantees that private property shall not "be taken for public use without just compensation." U.S. Const. amend. V. If regulation of property goes too far it will be recognized as a taking. *Lucas v. South Carolina Coastal Council,* 505 U.S. 1003, 1014–15, 112 S.Ct. 2886, 2892–93, 120 L.Ed.2d 798, 812 (1992) (quoting *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 415, 43 S.Ct. 158, 160, 67 L.Ed. 322 (1922)). There is no set formula for determining how far is "too far." *Lucas,* 505 U.S. at 1014–15, 112 S.Ct. at 2892–93, 120 L.Ed.2d at 812. There are, however, some guiding principles. For example, the Fifth Amendment is violated when land use regulation does not substantially advance legitimate state interest or denies an owner economically viable use of his land. *Lucas,* 505 U.S. at 1015–17, 112 S.Ct. at 2893–94, 120 L.Ed.2d at 813 (quoting *Agins v. Tiburon,* 447 U.S. 255, 260, 100 S.Ct. 2138, 2141, 65 L.Ed.2d 106 (1980)). A regulation may also constitute a taking if it extinguishes a fundamental attribute of ownership. *Agins v. Tiburon,* 447 U.S. 255, 262, 100 S.Ct. 2138, 2142, 65 L.Ed.2d 106 (1980) (citing *Kaiser Aetna v. United States,* 444 U.S. 164, 179–80, 100 S.Ct. 383, 392–93, 62 L.Ed.2d 332 (1979)). "The determination that governmental action constitutes a taking is, in essence, a determination that the public at large, rather than a single owner, must bear the burden of an exercise of state power in the public interest." *Agins,* 447 U.S. at 260, 100 S.Ct. at 2141.

As noted in *Peterman v. State Department of Natural Resources,* 446 Mich. 177, 521 N.W.2d 499 (1994), riparian rights are property and as such are "protected by

---

9. Assuming the doctrine of issue preclusion bars this Court's review of the Forest Service's authority to regulate private riparians' use of the waters of Crooked Lake, it would not bar this Court's review of Plaintiffs' takings claim because the prior action did not address this issue. In order to enable the appeal of the prior action to proceed the district court dismissed the takings claim without prejudice. *See* 89 F.3d at 1276 (Boggs, J., dissenting).

10. This Court is referring to an independent constitutional takings analysis. There was some discussion in the en banc concurring opinion in *Stupak–Thrall II* that the "subject to valid existing rights" language in § 5 of the MWA was essentially designed to restrain agencies from effecting a taking. *Id.* at 1270. (Moore, J. concurring). This Court agrees with the dissenting opinion that grafting a takings analysis onto the MWA is not appropriate. *See* 89 F.3d at 1294–96 (Boggs, J. dissenting).

the limits of the power of eminent domain." *Id.* at 192, 521 N.W.2d 499. "Riparian rights involve property rights that, if interfered with by the government, requires the payment of just compensation." *Mumaugh v. McCarley,* 219 Mich.App. 641, 646, 558 N.W.2d 433, 435 (1996). "The law in Michigan is clear that government interference with riparian rights and encroachment on private shoreland property may be so egregious as to constitute a taking, allowing an aggrieved property owner to maintain an inverse condemnation action . . . ." *Difronzo v. Village of Port Sanilac,* 166 Mich.App. 148, 152, 419 N.W.2d 756 (1988). "Riparian rights are property, for the taking or destruction of which by the State compensation must be made, unless the use has a real and substantial relation to a paramount trust purpose." *Id.* (quoting *Hilt v. Weber,* 252 Mich. 198, 225, 233 N.W. 159 (1930)).

In *Stupak–Thrall I* plaintiffs failed to produce any evidence that sailboats or houseboats had ever been used on Crooked Lake. 843 F.Supp. at 334. On en banc hearing, the concurrence reasoned that given the lack of evidence of sailboat or houseboat usage, Amendment No. 1 did not constitute a taking. Moreover, any occasional and recreational use of the type suggested by plaintiffs on rehearing was clearly not enough to establish a taking. 89 F.3d at 1271 (Moore, J., concurring).

This case differs materially from *Stupak–Thrall I.* The motorboat restrictions in Amendment No. 5 directly and significantly affect fundamental attributes of Plaintiffs' ownership and enjoyment of their property. In contrast to the absence of evidence of sailboat and houseboat usage in the prior case, in this case there is no dispute that the Stupak family has engaged in motorboat usage for over 50 years. There is also no dispute that the Gajewski's very livelihood depends on the use of motorboats by their fishing guests. There can be no real question that Amendment No. 5 will result in a significant diminution of value to the riparian land.

Given the size of Crooked Lake, the limitation on the size and type of motor would pose a significant restraint on the Plaintiffs' exercise of their riparian rights. If the riparian uses of this lake are to be taken for the public benefit, then Plaintiffs should be compensated for their loss. Plaintiffs are entitled to a declaration that Amendment No. 5, as applied to riparian owners, constitutes a taking in violation of the Fifth Amendment.

For the reasons stated in this opinion, Plaintiffs' motion for summary judgment will be granted and Defendants' motion for summary judgment will be denied. The Court will enter a declaration that Amendment No. 5 to the Ottawa National Forest Plan is invalid as applied to Plaintiffs for the reason that it is beyond the scope of the authority granted to the Forest Service under the Michigan Wilderness Act and constitutes a taking in violation of the Fifth Amendment to the United States Constitution. The Court will also enjoin Defendants from implementing the restrictions of Amendment No. 5 against the Plaintiffs and their guests.

The Court emphasizes that this is a narrow ruling. It does not affect the general right of the Forest Service to make regulations concerning the public's use of the Sylvania Wilderness. It applies only to one lake in the Sylvania Wilderness and to the few private riparian landowners who have historically used their private establishments for fishing and boating on Crooked Lake.

An order and judgment consistent with this opinion shall be entered.

### ORDER AND JUDGMENT

In accordance with the opinion entered this date,

**IT IS HEREBY ORDERED** that Plaintiffs' motion for summary judgment (Docket # 38) is **GRANTED.**

**IT IS FURTHER ORDERED** that Defendants' motion for summary judgment (Docket # 41) is **DENIED.**

**IT IS FURTHER ORDERED** that **JUDGMENT** is entered in favor of Plaintiffs, and it is hereby DECLARED that Amendment No. 5 to the Ottawa National Forest Plan is invalid as applied to Plaintiffs for the reason that it is beyond the scope of the authority granted to the Forest Service un-

der the Michigan Wilderness Act and constitutes a taking in violation of the Fifth Amendment to the United States Constitution.

**IT IS FURTHER ORDERED** that Defendants are **ENJOINED** from implementing the restrictions of Amendment No. 5 against the Plaintiffs and their guests.